**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION**

| | |
|---|---|
| LARRY HENRY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CNX RESOURCES CORP.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 2:20-cv-00553-PLD<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CNX RESOURCES
CORPORATION'S MOTION TO COMPEL ARBITRATION
AND STAY OR DISMISS JUDICIAL PROCEEDINGS**

Pursuant to Fed. R. Civ. P. 12(b)(6) and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3–4,[1] Defendant CNX Resources Corporation ("CNX") respectfully submits this Memorandum of Law in support of its Motion to Compel Arbitration and Stay or Dismiss Judicial Proceedings.

### I.  INTRODUCTION

This Court should send this case to arbitration. Henry, a highly paid and highly skilled gas and oilfield consultant, alleges that he provided services to CNX for about one year—from June 2018 through May 2019—during which time he was misclassified as an independent contractor and wrongfully denied overtime. But, Henry fails to advise this Court of a key fact: Henry would not have been allowed to provide services at CNX's gas drilling rig but for his contract with New Tech Global Ventures, LLC ("New Tech"). In this regard, Henry executed an independent contractor agreement, referred to as a Marketing Agreement, with New Tech, a Consultancy Firm,

---

[1] The FAA, 9 U.S.C. §§ 3–4 allows for dismissal of this action. To the extent necessary, CNX also brings this motion under Federal Rules of Civil Procedure 12(b)(6).

1

which placed him on a project at CNX performing well site project-management duties. New Tech processed and paid his invoices to CNX, provided him with general liability insurance, and verified his credentials.

Henry's Marketing Agreement with New Tech governed the independent contractor services he performed for CNX. By executing the Marketing Agreement, Henry agreed he was an independent contractor of CNX and agreed to arbitrate any dispute related to or arising under the Marketing Agreement. Although CNX is a non-signatory to this Arbitration Agreement, it may enforce the Arbitration Agreement against Henry pursuant to well-settled authority in the Third Circuit and Pennsylvania.

As a threshold matter, it is important to note that the Arbitration Agreement at issue here broadly delegates issues of arbitrability to the Arbitrator. The U.S. Supreme Court has made clear that such broad delegations include issues concerning whether a non-signatory may enforce an arbitration agreement. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019). Therefore, based upon compelling precedent and the terms of the Arbitration Agreement, an Arbitrator should decide the question of whether CNX may enforce the Arbitration Agreement Henry signed with New Tech. *Id.*

However, should this Court decide to address the issue of whether CNX may enforce the Arbitration Agreement, it should find in the affirmative based on Third Circuit authority. *Noye v. Johnson & Johnson Servs., Inc.*, 765 F. App'x 742 (3d Cir. 2019). Under Pennsylvania's doctrine of alternative equitable estoppel, CNX is entitled to enforce the Arbitration Agreement because there is a close and obvious nexus between CNX and the contract containing the Arbitration Agreement (*i.e.*, Marketing Agreement). The Marketing Agreement was the vehicle that placed Henry at CNX. It incorporated the Master Services Agreement between CNX and New Tech—

2

the contract delineating New Tech's responsibilities vis-à-vis consultants, such as Henry, that it placed with CNX—and it governed Henry's services respecting quality control, safety and invoicing.

Finally, the Arbitration Agreement is enforceable because it clearly covers Henry's claims. Henry's contention that he was misclassified as an independent contractor is obviously related to and arises under the Marketing Agreement he executed in order to secure the work now underlying his claims—the same agreement where Henry agreed that he was an independent contractor with respect to CNX. Courts have held that non-signatories could enforce arbitration agreements where a similar triangular relationship was present. *See, e.g.*, *Noye*, 765 F. App'x at 747.

Accordingly, for all of these reasons, more fully explained *infra*, there is overwhelming support for compelling this case to arbitration.

## II. FACTUAL BACKGROUND

**A.** **HENRY'S MARKETING AGREEMENT WITH NEW TECH GLOBAL VENTURES.**

Henry is a highly-paid, highly-skilled gas and oilfield consultant, generating revenue of over $1,400.00 per day for his services (which equates to well over $300,000 annually, assuming a five-day work-week). Henry alleges that he worked for CNX from June 2018 through May 2019. (Doc. No. 1, Compl. ¶ 25.) But he fails to disclose to this Court that during this time, he was working through New Tech Global Ventures, LLC ("New Tech"), a Consultancy Firm. (*See* Declaration of Larry Cress ("Cress Decl."), ¶ 12, Ex. 1; *see also* Declaration of Luke Beebe ("Beebe Decl."), ¶ 11.)

On or around April 11, 2018, Henry executed a Marketing Agreement with New Tech for "[New Tech] to provide marketing services and for [Henry] to provide professional consulting services . . . for well site operations, engineering and project management activities in the oil and gas industry". (*See* Cress Decl., ¶ 11, Ex. 1 ¶ 1; *see also* Beebe Decl. ¶ 14.) Henry provided his

3

services as "an independent contractor to Company [*e.g.*, CNX] and Marketing Agent [*i.e.*, New Tech]." (Cress Decl., Ex. 1 ¶ 14; *see also* Beebe Decl. ¶ 13.) By entering into the Marketing Agreement, Henry agreed that he would "abide by the terms of the relevant Company Agreement"—*i.e.*, the Master Service Agreement ("MSA") or Work Order between New Tech and the relevant oil and gas exploration company (called "Operators" in the industry). (Cress Decl. ¶ 1.) Indeed, the Marketing Agreement expressly incorporated the terms and conditions of the applicable MSA. (Cress Decl., Ex. 1 ¶¶ 1, 12; *see also* Beebe Decl. ¶ 17.)

The Marketing Agreement set forth requirements to ensure Henry's quality of work product for the Operator (*i.e.*, "the Company"):

- Henry agreed to "perform Work in a good and workmanlike manner using the best standards of the industry and to diligently follow the instructions of Company." (Cress Decl., Ex. 1 ¶ 2.)

- Henry agreed "to maintain, and shall provide, evidence of professional qualifications and certifications, shall maintain required health, safety and educational requirements, and shall perform all Assignments"—*i.e.*, consulting work for an Operator—"in accordance with them." (*Id.* ¶ 3.)

- Henry agreed to "determine the details of executing the Assignment and provide updates of an Assignment in accordance with prevailing industry standards to Company[.]" (*Id.* ¶ 4.)

- Henry agreed to supervise any subcontractors that he employed to complete or assist with an Assignment. (*Id.* ¶¶ 11, 17.)

- Henry agreed to "familiarize [himself] . . . with Company's regulations and policies." (*Id.* ¶ 18.)

- Henry agreed to "maintain confidentiality about . . . Company information and processes" and "adhere to any confidentiality requirements in the [MSA]." (*Id.* ¶ 20.)

New Tech also processed and paid the invoices Henry generated through his consulting work. (*See id.* ¶¶ 1, 5, 9; *see also* Beebe Decl. ¶ 15.) This arrangement worked as follows: Henry provided professional consulting services to CNX; he generated and sent an invoice covering such

4

services to New Tech; New Tech, in turn, paid this invoice and then invoiced CNX, at a slightly higher amount, and collected payment from CNX. (*See* Beebe Decl. ¶¶ 9, 15.)

The Marketing Agreement also contained a broad arbitration clause (the "Arbitration Agreement" or "Arbitration Clause"):

> If the parties (or their respective directors, officers, employees, consultants and contractors) have a dispute related to or arising under this Agreement that cannot be resolved amicably, either party shall invoke mandatory arbitration with respect to any claim, dispute or controversy as the exclusive method for resolving such dispute. . . . All claims, disputes or controversies . . . shall be decided by binding arbitration by the American Arbitration Association in accordance with its Expedited Commercial Arbitration Rules. All claims must be brought in an individual capacity, not as a plaintiff or class member in any purported class or representative proceeding.

(*Id.* ¶ 22.)

**B.** **THE MASTER SERVICES AGREEMENT BETWEEN CNX AND NEW TECH.**

The MSA between CNX and New Tech specified that New Tech would provide CNX "with personnel outplacement services, delivering to [CNX] applicants to work . . . as independent consultants and not as employees." (Cress Decl., Ex. 2 at 5 ¶ 7; *see also* Beebe Decl. ¶ 4.) Under the MSA, New Tech was responsible for ensuring the consultants it placed with CNX, such as Henry, had appropriate personal protective equipment, passed a drug and alcohol test, were covered by insurance (e.g., accident), and could lawfully work in the United States (among other responsibilities). (*See* Cress Decl., Ex. 2 at 7–15; *see also* Beebe Decl. ¶ 10.)

The MSA's terms and conditions bound not just CNX and New Tech, but any of New Tech's sub-contractors (i.e., consultants). (Cress Decl., Ex. 2 at 4, 15 ¶ 5) ["[New Tech] will ensure that these obligations, representations and warranties flow down to all subcontractors to contractor. . ."]). The MSA chose Pennsylvania law as the governing law. (*Id.* at 6 ¶ 18.)

5

It is through this strategic, triangular relationship—between consultant, consultancy firm, and operator—that Henry furnished his consulting services to CNX.

### III. ARGUMENT AND CITATION OF AUTHORITY

Congress enacted the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–14, to thwart "widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018).[2] Pursuant to this authority, a court may compel arbitration when a party entered such an agreement. *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001). Non-signatories to an arbitration agreement may also compel arbitration under, *inter alia*, the state law doctrine of "estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *Noye v. Johnson & Johnson Servs., Inc.*, 765 F. App'x 742, 745 (3d Cir. 2019).

Fed. R. Civ. P. 12(b)(6) is a proper vehicle to compel arbitration. *See Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 776 (3d Cir. 2013); *Torres v. CleanNet USA, Inc.*, 90 F. Supp. 3d 369, 375 (E.D. Pa. 2015). On such a motion, documents "integral to or explicitly relied upon in the complaint may be considered," including "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Torres*, 90 F. Supp. 3d at 376; *see also Hewitt v. Rose Group*, No. 15-cv-5992, 2016 WL 2893350, at *2 n.1 (E.D. Pa. Mar. 21, 2016) ("It would frustrate the purposes of the Federal Arbitration Act if plaintiffs could avoid having their claims quickly compelled to

---

[2] The FAA declares that "[a] written provision in any . . . contract . . . to settle by arbitration . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

6

arbitration simply by failing to mention the existence of clearly applicable arbitration agreements in their complaints.").[3]

This Motion should be granted for the following reasons: (A) the Arbitration Agreement is valid and enforceable; (B) all questions of arbitrability should be decided by the arbitrator; (C) CNX may enforce the Arbitration Agreement under the Pennsylvania state-law doctrine of "alternative equitable estoppel"; and (D) the Arbitration Agreement covers Henry's claims.

### A. A VALID ARBITRATION AGREEMENT EXISTS.

It cannot be credibly disputed that the Arbitration Agreement is valid and enforceable, at least with respect to Henry and New Tech.[4] (*See* Cress Decl., Ex. 1.) Pennsylvania law employs the following test to determine whether an enforceable contract has been formed: "(1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *Atacs Corp. v. Trans Word Commc'ns, Inc.*, 155 F.3d 659, 666 (3d Cir. 1998). The Marketing Agreement, which contains the Arbitration Agreement, meets this test.

Accordingly, as the Arbitration Agreement is valid, the only question is whether CNX, as a non-signatory, may enforce its provisions vis-à-vis Henry.

---

[3] *See also Berryman v. Newalta Envtl. Servs., Inc.*, No. 18-793, 2018 WL 5723290, at *3 (W.D. Pa. Nov. 1, 2018) (applying Rule 12(b)(6) standard in compelling arbitration on non-signatory's motion); *Colon v. Conchetta, Inc.*, No. 17-0959, 2017 WL 2572517, *3 (E.D. Pa. June 14, 2017) ("Colon does not even reference the Agreement in her Complaint, much less attach it as an exhibit. However, we find that fact to be irrelevant, as the genesis of her claims clearly stems from the Agreement she entered into.").

[4] CNX contends that the forum's law should apply, as all the alleged underlying conduct and alleged unlawful conduct occurred in Pennsylvania. *See Travelers Ins. Co. v. Davis*, 490 F.2d 536, 542 (3d Cir. 1974).

**B.** **THE GATEWAY ISSUE OF WHETHER CNX CAN ENFORCE THE ARBITRATION AGREEMENT MUST BE DECIDED BY THE ARBITRATOR.**

The Arbitrator, in the first instance, should answer this question. The FAA allows parties to "agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). "When the parties' contract delegates the arbitrability question to an arbitrator, . . . a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Id*. at 529.

> Here, the Arbitration Agreement delegates any question of arbitrability to the arbitrator:
>
> If the parties (or their respective directors, officers, employees, consultants and contractors) have a dispute related to or arising under this Agreement that cannot be resolved amicably, either party shall invoke mandatory arbitration with respect to any claim, dispute or controversy as the exclusive method for resolving such dispute. . . . <u>All claims, disputes or controversies</u> . . . <u>shall be decided by binding arbitration by the American Arbitration Association in accordance with its Expedited Commercial Arbitration Rules</u>.

(Cress Decl., Ex. 1, ¶ 21 (emphasis added).) The American Arbitration Association's ("AAA") Expedited Commercial Arbitration Rules, in turn, delegate to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA Commercial Arbitration Rules and Mediation Procedures, R. 7(a) (2013).[5] That provision "is about as 'clear and unmistakable' as language can get." *Richardson v. Coverall N. Am., Inc.*, No. 18-3393, 2020

---

[5] *Available at* https://adr.org/sites/default/files/Commercial%20Rules.pdf.

WL 2028523, at *2 (3d Cir. Apr. 28, 2020) (quoting *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11 (1st Cir. 2009)) (holding that the incorporation of the AAA Rules in the arbitration clause constitutes clear and unmistakable evidence that the parties agreed to delegate arbitrability, even with respect to an "unsophisticated party").[6]

Indeed "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Id.* at *2 n.2 (internal quotations and citations omitted); *see also Ins. Newsnet.com, Inc. v. Pardine*, No. 11-cv-286, 2011 WL 3423081, *3 (M.D. Pa. Aug. 4, 2011) ("The prevailing rule across jurisdictions is that incorporation by reference of rules granting the arbitrator the authority to decide questions of arbitrability—especially the [AAA R]ules—is clear and unmistakable evidence that the parties agreed to submit arbitrability questions to the arbitrators."); *Way Servs., Inc. v. Adecco N. Am., LLC*, No. 06-cv-2109, 2007 WL 1775393, *4 (E.D. Pa. June 18, 2007) (same).

Moreover, this broad delegation applies to the question of whether CNX, as a non-signatory, may enforce the agreement:

> [T]o adjudicate whether [plaintiff] is bound to arbitration with parties that she alleges are nonsignatories would be to engage in the type of analysis that the Supreme Court held impermissible in *Henry Schein, Inc. v. Archer & White Sales, Inc.* There, the Court opined that once the parties have a delegation clause, "a court possesses *no power* to decide the arbitrability issue," *Henry Schein, Inc.*, 139 S.Ct. at 529 (emphasis added), and that "[j]ust as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator." *Id.* at 530.

---

[6] *Zabokritsky v. JetSmarter, Inc.*, No. 19-273, 2019 WL 2563738, at *4 (E.D. Pa. June 20, 2019) ("Here, the parties' agreement and the incorporated AAA Rules commit the threshold question of arbitrability to the arbitrator, not a court."); *Indocarb Corp. v. Madhavan*, No. 2:19-cv-889, 2020 WL 1610734, at *6–7 (W.D. Pa. Apr. 2, 2020) (finding that it was not plain error to find that the arbitration provision was clearly and unmistakably delegates arbitrability issues to the arbitrator when the provision provided that "any disagreement arising under this Agreement . . . will be resolved by arbitration in accordance with the rules of the [AAA]).

> ***Whether a nonsignatory can enforce the arbitration agreement is a question of the enforceability of the arbitration clause, as to that defendant.*** The parties agreed to delegate such questions to an arbitrator.

*De Angelis v. Icon Entm't Group Inc.*, 364 F. Supp. 3d 787, 796–97 (S.D. Ohio 2019) (internal citations omitted) (emphasis added).

The same rationale applies with equal force here. The Arbitration Agreement expressly adopts the AAA's rules, which, in turn, grant the arbitrator wide authority to rule on arbitrability issues. (Cress Decl., Ex. 1, ¶ 22.) Accordingly, the Court should compel arbitration and have the arbitrator decide the gateway issue of arbitrability with respect to CNX.[7] The authorities in favor abound. *See, e.g.*, *Brittania-U Nigeria, Ltd. v. Chevron USA, Inc.*, 866 F.3d 709, 714–15 (5th Cir. 2017) (holding that delegation of arbitrability applied to non-signatory defendants because the party seeking to avoid arbitration, the plaintiff, was signatory); *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) ("Whether a particular arbitration provision may be used to compel arbitration between a signatory and a nonsignatory is a threshold question of arbitrability."); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 211 (2d Cir. 2005) (affirming district court decision concluding that signatory to an arbitration agreement must arbitrate dispute against non-signatory because issue of arbitrability itself is subject to a decision by the arbitrator); *Turner v. PillPack, Inc.*, No. 5:18-cv-66, 2019 WL 2314673, at *6 (W.D. Ky. May 30, 2019) (holding that because arbitration agreement delegated issues of arbitrability to arbitrator, if jury found that plaintiff entered into that agreement with non-party, issue of whether plaintiff must arbitrate claims against non-signatory defendant was to be

---

[7] Should the arbitrator decide, at any point, that it lacks authority over certain of Henry's claims, Henry may always move to resume such claims before this Court. *See* 9 U.S.C. § 3; *see also Berryman*, 2018 WL 5723290, at *10 ("Rather than dismiss the case, the court will stay the action pending arbitration. This approach promotes greater judicial efficiency and effectuates the FAA's intent by requiring timely arbitration without allowing a lengthy appeal process at the outset.").

10

decided by arbitrator); *Riversa v. L-3 Commc'ns Corp.*, No. 8:09-cv-02447, 2010 WL 11629016, at *2 (M.D. Fla. May 24, 2010) (concluding that whether non-signatories "are ultimately entitled to enforce the arbitration clause is a matter of the agreement's continued existence, validity, and scope which must be decided by the arbitrator").

C.  **CNX MAY ENFORCE THE ARBITRATION AGREEMENT UNDER THE DOCTRINE OF "ALTERNATIVE EQUITABLE ESTOPPEL".**

Even if this Court does decide whether CNX may compel Henry to arbitrate, it should do so. "Under Pennsylvania law, 'non-signatories to an arbitration agreement can enforce such an agreement when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties.'" *Noye*, 765 F. App'x at 746 (quoting *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351 (Pa. Super. Ct. 2006)). An "obvious and close nexus" may arise from *either* (a) the relationship between the signatories and the non-signatory *or* (b) the relationship between the non-signatory and the contract containing the arbitration obligation. *Id*. (citing *Provenzano v. Ohio Valley Gen. Hosp.*, 121 A.3d 1085, 1097 (Pa. Super. Ct. 2015); *Dodds*, 909 A.2d at 351).

For example, in *Noye v. Johnson & Johnson Servs. Inc.*, an employee tried to avoid arbitrating statutory claims against his employer's customer, even though he had signed an arbitration agreement with his employer, a staffing company. 765 F. App'x at 743–44. The district court denied the customer's motion to compel arbitration, but the Third Circuit found this was reversible error, holding that "alternative equitable estoppel may be invoked given the 'obvious and close nexus between' non-signatory J&J [the customer] and 'the contracting parties,' Kelly [i.e., the employer] and Noye [the plaintiff]." *Id*. at 747.

The Third Circuit's finding of an "obvious and close nexus" was predicated on the fact that "the Arbitration and Employment Agreements . . . were the vehicles to place Noye, a Kelly employee, with J&J [the non-signatory customer]." *Id*. The same type of situation is present here.

11

The Marketing Agreement, which contains the Arbitration Clause, was the vehicle that placed Henry at CNX. Without it, and without going through New Tech's screening process and utilizing its invoicing services, Henry would not have performed any work for CNX.

Notably, the Third Circuit's decision in *Noye* did not break any new ground. Its holding is firmly rooted in the widely-recognized equitable principle that estoppel exists to "prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from relying on the contract when it works to his advantage by establishing the claim, and repudiating it when it works to his disadvantage by requiring arbitration." *Aluminum Bahrain B.S.C. v. Dahdaleh*, 17 F. Supp. 3d 461, 470 (W.D. Penn. 2014). Henry is doing just that—he signed the Marketing Agreement to be eligible to perform the work for CNX that he now claims gives rise to his entitlement to overtime. The Marketing Agreement, which contains the Arbitration Clause, is the *sine qua non* to Henry's overtime claims; he cannot be allowed to disavow it. *See E.I. DuPont*, 269 F.3d at 199 ("courts have bound a signatory to arbitrate with a non-signatory . . . [when] the claims were intimately founded in and intertwined with the underlying contract obligations").

Indeed, the triangular relationship between New Tech, CNX, and Henry make it plain that there was a "close and obvious nexus" between all three:

- Henry performed consulting services to CNX via the Marketing Agreement;

- The Marketing Agreement expressly incorporates the MSA between New Tech and CNX and subjects the MSA's terms to Henry;

- New Tech screened, tested, and insured Henry before Henry was eligible to consult for CNX pursuant to the Marketing Agreement and MSA; and

- Henry invoiced New Tech for services he rendered to CNX, New Tech paid Henry's invoices at a discounted rate, New Tech invoiced CNX, and then CNX paid New Tech pursuant to the Marketing Agreement and MSA.

Thus, this case is on all fours with *Noye*, because the Marketing Agreement, which contains the Arbitration Clause, and the promises and obligations flowing therefrom, "were the vehicles to place [Henry] . . . with [CNX]." *See Noye*, 765 F. App'x at 747. A Pennsylvania trial court reached a similar conclusion. In *Wellington v. Westrum Dev. Co.*, a non-signatory (a contractor) was allowed to enforce an arbitration agreement because the agreement referenced a contract connecting the non-signatory to the plaintiff. No. 00992, 2011 WL 1524171, at *4, 23 Pa. D. & C.5th 353, 358 (Pa. Com. Pl. Mar. 17, 2011). Here, although the Arbitration Clause does not itself reference the MSA, the Marketing Agreement does, underscoring the close and obvious nexus of the relationship between CNX and the contract containing the arbitration obligation (i.e., the Marketing Agreement). *See Noye*, 765 F. App'x at 746.[8]

Indeed, numerous courts across the country have allowed non-signatories to enforce arbitration provisions where, as here, the plaintiff's allegations stemmed from a contract containing an arbitration clause. For example, in *Tuggle v. Rockwater Energy Solutions, Inc.*, the defendant sought to enforce arbitration agreements between the signatory staffing companies and plaintiffs despite being a nonsignatory to them. No. H-18-4746, 2019 WL 7040330, at *3 (S.D. Tex. Dec. 3, 2019), *recommendation adopted by* No. H-18-4746, 2019 WL 6971660 (S.D. Tex. Dec. 19, 2019). Although the defendant was a non-signatory to the arbitration agreement, **it was party to a master services agreement with the staffing company**. *Id.* Like here, the master services agreement contemplated that the staffing company would supply consultants to work for defendant. *Id.* In finding in favor of compelling arbitration, the court reasoned that plaintiff's

---

[8] *See also Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A.3d 465, 479 (Pa. Sup. Ct. 2017) (reversing trial court's refusal to compel arbitration on motion of non-signatory); *Provenzano*, 121 A.3d at 1097 (reversing trial court's refusal to compel arbitration on motion of non-signatory defendants, who claim they were named as defendants "in an effort to sidestep the . . . arbitration clause").

13

dispute with defendant <u>arose out of and related to his independent contractor agreement</u>—
"[b]ecause [plaintiff] sought recovery based on the relationship created by the [agreement], he was required to arbitrate the claims arising out of that same agreement." *Id.* The Court further reasoned that "[b]y enforcing the arbitration clause, the non-signatory is agreeing to arbitrate while '[t]he signatory is merely being held to his previous agreement to arbitrate.'" *Id.* (citation omitted). <u>The exact triangular arrangement is present here</u>.[9]

Moreover, the Marketing Agreement will be front and center in this litigation. It detailed the obligations flowing between Henry and CNX (as well as New Tech), defined Henry as an independent contractor, and specified how he was paid for the services he rendered to CNX. (*See generally* Cress Decl., Ex. 1; *see also* Beebe Decl. ¶¶ 13–18.) Henry simply cannot hide from it. Thus, allowing CNX to enforce the Arbitration Agreement is proper because Henry's claims necessarily depend on the Marketing Agreement and he will not be able to establish his claims without reference to it. *See Provenzano*, 121 A.3d at 1102–03 (non-signatories could enforce the arbitration clause found in the employment contract because the plaintiff's claims under the

---

[9] *See also Dennis v. United Van Lines, LLC*, No. 4:17CV1614 RLW, 2017 WL 5054709, at *4 (E.D. Mo. Nov. 1, 2017) (concluding that non-signatory defendant could enforce the arbitration provision because plaintiff's claims depended on the work he performed pursuant to his contract with the signatory, non-defendant); *Judge v. UniGroup, Inc.*, No. 8:17-CV-201-T-23CPT, 2018 WL 4765234, at *2 (M.D. Fla. Aug. 16, 2018) (applying equitable estoppel and holding that a non-signatory to independent contractor agreements between plaintiffs and their agent which resulted in plaintiffs doing consulting work for the non-signatory required compelling arbitration); *Ortiz v. Volt Mgmt. Corp.*, No. 16-cv-07096, 2017 WL 2404977, at *2 (N.D. Cal. June 2, 2017) (determining a non-signatory could compel arbitration of plaintiff's FLSA and state wage law claims where plaintiff signed an arbitration agreement with a staffing agency and then was assigned to work for a non-signatory because plaintiff's statutory claims "were intimately founded and intertwined with his employment relationship with the signatory staffing agency") (internal quotes and citations omitted); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993) (identifying three factors in compelling arbitration and noting that primary factor was the degree to which the claims arose out of the obligations and duties contained in the contract at the heart of the dispute).

14

Pennsylvania Wage Payment and Collection Law "arose out of the alleged breach of the employment contract, it is wholly dependent on the contract, and Appellee cannot make out his WPCL claim without reference to the employment contract").

Finally, and relatedly, it was entirely foreseeable that CNX would seek to utilize the Arbitration Clause. The whole point of the Marketing Agreement was to bridge Henry's consulting services with CNX's needs for those services. The Marketing Agreement expressly incorporated the MSA that New Tech had with CNX. Therefore, "it is more foreseeable, and thus more reasonable, that a party who has actually agreed in writing to arbitrate claims with someone might be compelled to broaden the scope of his agreement to include others." *Sapic v. Gov't of Turkm.*, 345 F.3d 347, 361 (5th Cir. 2003).[10]

In sum, as a matter of settled law, CNX must be allowed to compel Henry's claims to arbitration, and on an individual basis only.

**D.  HENRY'S CLAIMS ARE COVERED BY THE ARBITRATION AGREEMENT.**

Since CNX is permitted to enforce Henry's arbitration agreement, the only remaining question is whether Henry's claims fall within the scope of that arbitration agreement. The Arbitrator should first address this question. Regardless, Henry's claims squarely fall within the Arbitration Agreement.

---

[10] *See also Legacy Wireless Servs., Inc. v. Human Capital, L.L.C.*, 314 F. Supp. 2d 1045, 1055 (D. Or. 2004) (same); *Achey v. BMO Harris Bank, N.A.*, 64 F. Supp. 3d 1170, 1177–78 (N.D. Ill. 2014) (finding that an arbitration agreement in the loan documents was enforceable by the bank, a non-signatory, based on equitable estoppel—the bank's role in the transactions was such that it would have been foreseeable that the borrower would be required to arbitrate her claims against the bank, and the borrower's claims depended on the alleged illegality of the loans and therefore arose out of the loan agreements); *Graham v. BMO Harris Bank, N.A.*, No. 3:13cv1460 (WWE), 2014 WL 4090548, at *6 (D. Conn. July 16, 2014).

In determining whether Henry's claims fall within the scope of the arbitration agreement, federal law applies, and there is a "presumption of arbitrability." *Berryman*, 2018 WL 5723290, at *8 (citations omitted). The "focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 45 (3d Cir. 2001) (citations omitted). The presumption of arbitrability is especially strong where, as here, the arbitration clause is broad—Henry agreed to arbitrate any "dispute related to or arising under this Agreement." (Cress Decl., Ex. 1 ¶ 22.) *See Brayman Const. Corp. v. Home Ins. Co.*, 319 F.3d 622, 625 (3rd Cir. 2006) (stating, "the presumption [in favor of arbitrability] is particularly applicable where the [arbitration] clause is . . . broad"). This is "the quintessential broad arbitration provision" because "phrases such as 'arising under' . . . are normally given broad construction." *Kauffman v. U-Haul Int'l, Inc.*, No. 5:16-cv-04580, 2018 WL 4094959, at *30 (E.D. Pa. Aug. 28, 2018) (citations omitted).[11]

Based on these principles, Henry's claims that he was misclassified as an independent contractor and entitled to, but denied, overtime premiums squarely fall within the ambit of the Arbitration Agreement. First, Henry's claim that he was misclassified as an independent contractor is obviously "related to or arises out of" the agreement he executed in order to secure the work now underlying his claims—the same agreement where Henry agreed that he "is an independent contractor to [CNX] and [New Tech]." (Cress Decl., Ex. 1, ¶ 14.) Second, Henry's claim for unpaid overtime is "related to or arises out of" the same agreement, which spells out the

---

[11] Pennsylvania appellate case law considering similarly worded clauses have held that such clauses are unlimited arbitration clauses and any claims implicating the contract can be compelled to arbitration. *See Dodds*, 909 A.2d at 351 (arbitration clause that read "Any controversy, claim, or dispute arising out of or relating to this Agreement" compels arbitration of fraud claims); *Smay v. Stuebner, Inc.*, 864 A.2d 1266, 1276 (Pa. Super. Ct. 2004) (arbitration clause that read "Any controversy or Claim arising out of or related to the Contract," interpreted broadly to include all claims arising from the contract regardless of whether the claim sounds in tort or contract.)

16

terms of his compensation. At the very least, it can hardly be said with "positive assurance" that Henry's misclassification and overtime claims are not covered as a claim "related to or arising out of" his agreement. *See, e.g.*, *Tuggle*, 2019 WL 7040330, at *3 (finding in favor of compelling arbitration where plaintiff's dispute with defendant <u>arose out of and related to his independent contractor agreement</u> with the staffing company—"[b]ecause [plaintiff] sought recovery based on the relationship created by the [independent contractor agreement], he was required to arbitrate the claims arising out of that same agreement."); *Dennis*, 2017 WL 5054709, at *4 (finding plaintiff's claims against nonsignatory defendant depended on his classification as an independent contractor and the work he performed as a truck driver under the Independent Contractor Operating Agreement with nonparty signatory).

Notably, the fact that Henry is asserting those covered claims against a non-party to his arbitration agreement does not preclude arbitration. For example, the arbitration agreement at issue in *Colon* only applied to claims "between the Parties," but the plaintiff had asserted his claims against a non-party. 2017 WL 2572517, at *7. The Eastern District of Pennsylvania nevertheless compelled arbitration of the claims against the non-party. *Id.*

## IV. CONCLUSION

For all of the above reasons, the Court should grant this Motion and send Henry's claims to arbitration.

Respectfully submitted this 26th day of May, 2020.

17

**CHAMBERLAIN HRDLICKA
 WHITE WILLIAMS & AUGHTRY**

By: */s/ Annette A. Idalski*
Annette H. Idalski, *pro hac vice*
Raed "Ray" Abilmouna, *pro hac vice*
Kyle Winnick, *pro hac vice*
191 Peachtree Street, N.E., 46th floor
Atlanta, GA 30303-1747
Telephone: (404) 658-5386
annette.idalski@chamberlainlaw.com
ray.abilmouna@chamberlainlaw.com
kyle.winnick@chamberlainlaw.com

**DICKIE, MCCAMEY & CHILCOTE. P.C.**
J.R. Hall
PA ID No. 88296
Two PPG Place
Pittsburgh, PA 15222
Telephone: (412) 392-5390
jhall@dmclaw.com

*Attorneys for Defendant CNX Resources Corporation*

## CERTIFICATE OF SERVICE

This is to certify that on May 26, 2020, I served and filed the foregoing with the Court's CM/ECF electronic filing system, which automatically generates notice and service upon all counsel of record.

By: */s/ Annette A. Idalski*
  Annette H. Idalski

3489381.V2