IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LARRY HENRY, individually and on behalf of all others similarly situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CNX RESOURCES CORP., )<br>)<br>Defendant. )<br>)<br>) | Civil Action No. 20-553 |

**REPORT AND RECOMMENDATION**

**I.   RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Compel Arbitration (ECF No. 20) be granted and the action be stayed pending the outcome of said arbitration. It is further recommended that Defendant's Motion to Dismiss (ECF No. 21) be denied without prejudice.

**II.   REPORT**

   **A.   PROCEDURAL HISTORY**

Plaintiff Larry Henry ("Henry") filed this lawsuit against Defendant CNX Resources Corp. ("CNX") in which he seeks to recover alleged overtime wages and other damages from under the Fair Labor Standards Act and the Pennsylvania Minimum Wage Act. (ECF No. 1 ("Compl.").) CNX responded by filing both a Motion to Compel Arbitration (ECF No 20) and a Motion to Dismiss (ECF No. 21). The Motion to Compel has been fully briefed and is ripe for disposition. (ECF Nos. 25, 30, 32.)[1]

---

[1] CNX also seeks dismissal for lack of jurisdiction and for failure to state a claim upon which relief can be granted. (ECF No. 21.) For the reasons that are set forth herein, the merits of that motion will not be addressed in the Report and Recommendation.

B.   FACTUAL BACKGROUND

CNX, a Delaware corporation headquartered in Pennsylvania, is a natural gas exploration, development, and production company. (Compl. ¶¶ 16, 23.) Henry worked for CNX in Pennsylvania for about a year. (*Id.* ¶¶ 9, 10.) He alleges that, throughout that time, he was paid a day-rate with no overtime compensation and was misclassified as an independent contractor. (*Id.* ¶¶ 11, 41.)

During his relationship with CNX, Henry was working through a consultancy firm, i.e., New Tech Global Ventures, LLC ("New Tech"). (*See* ECF No. 22 ("Declaration of Larry Cress ("Cress Decl.")") ¶¶ 3, 12; ECF No. 23 ("Declaration of Luke Beebe ("Beebe Decl.")") ¶ 11.)[2] New Tech connects oil field professionals known as "consultants," such as Henry, with companies like CNX who are known as "operators" within the oil and gas industry. (Cress Decl. ¶¶ 3, 4; Beebe Decl. ¶¶ 3, 4.) New Tech provides administrative services such as matching "consultants" to specific projects, providing them with general commercial liability insurance, and processing and paying the invoices generated through their work in a timely manner. (Cress Decl. ¶ 4, 11.) In exchange, "consultants" sell their invoices at a discount to New Tech, which then bills the "operators" the full amount for the services performed by "consultants." (*Id.* ¶ 5.) "Operators," in turn, contract with New Tech for services such as ensuring that "consultants" are qualified, have obtained all required certifications, and have passed a drug and alcohol test. (*Id.* ¶ 10; Beebe Decl. ¶ 10.)

The Master Service Agreement (ECF No. 22-2 ("MSA")) between CNX and New Tech obligated New Tech to ensure, among other things, that the "consultants" it placed with CNX had

---

[2] In support of its motion, CNX has submitted declarations of New Tech's CEO Larry Cress and CNX's Director of Drilling Luke Beebe. Henry does not dispute the facts set out in those declarations.

appropriate personal protective equipment, passed a drug and alcohol test, were covered by insurance, and could lawfully work in the United States. (Cress Decl. ¶ 14; Beebe Decl. ¶ 10.) The MSA specified not only that New Tech was providing these services to CNX as an "independent contractor," but also that it will be provide applicants to work for CNX "as independent consultants and not as employees." (MSA at 5 ¶ 7; Beebe Decl. ¶ 4.) CNX and New Tech agreed that the MSA will be construed in accordance with the laws of Pennsylvania. (MSA ¶ 18.)

New Tech also entered into an agreement with Henry (ECF No. 22-1 ("Marketing Agreement")), for "[New Tech] to provide marketing services and for [Henry] to provide professional consulting services. . ." (Marketing Agreement ¶ 1; Cress Decl. ¶ 12; Beebe Decl. ¶ 14.) The Marketing Agreement specified that Henry would provide his services as "an independent contractor" to both New Tech and to the relevant "operators." (Marketing Agreement ¶ 14, Beebe Decl. ¶ 13.) The Marketing Agreement also incorporated the terms and conditions of the agreement (in this case, the MSA) between New Tech and the "operator" with whom Henry was placed (here, CNX). (Marketing Agreement ¶¶ 1, 12.) Pursuant to the terms of the Marketing Agreement, New Tech processed and paid the invoices that Henry generated through his consulting work at CNX. (Id. ¶ 5; Beebe Decl. ¶ 15.)

New Tech and Henry agreed that the Marketing Agreement is governed by the laws of the Texas. (Marketing Agreement ¶ 21.) The Marketing Agreement also contained the following arbitration clause ("Arbitration Clause"):

> If the parties . . . have a dispute related to or arising under this Agreement that cannot be resolved amicably, either party shall invoke mandatory arbitration with respect to any claim, dispute or controversy as the exclusive method for resolving such dispute . . . All claims, disputes or controversies . . . shall be decided by binding arbitration by the American Arbitration Association in accordance with its Expedited Commercial Arbitration Rules. All claims must be brought in an individual capacity, not as a plaintiff or class member in any purported class or representative proceeding.

3

(*Id.* ¶ 22.)

CNX now seeks to enforce the Arbitration Clause in the Marketing Agreement and compel arbitration of Henry's claims.

C. **STANDARD OF REVIEW**

Depending on the nature of the complaint and its supporting documents, a motion to compel arbitration will be evaluated under either the standard set forth in Rule 12(b)(6) or Rule 56 of the Federal Rules of Civil Procedure. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773–76 (3d Cir. 2013). The Third Circuit has held that "when it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'" *Id.* at 776 (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)). In contrast, "if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue," the parties are entitled to discovery on the issue of arbitrability and the Court applies the standard under Rule 56. *Id.*

In this case, the Complaint on its face fails to assert any allegations suggesting that Henry's claims may be subject to an enforceable arbitration agreement. Thus, the Rule 12(b)(6) standard is not applicable here. In support of its motion, CNX has included the MSA and the Marketing Agreement along with declarations of New Tech's CEO and CNX's Director of Drilling. Because the Court has considered these documents in assessing the merits of CNX's motion, it applies the Rule 56 standard. Henry neither suggests that any material issues of fact exist with respect to the MSA or the Marketing Agreement, nor challenges the facts asserted in the declarations provided

4

by CNX. As parties raise only legal arguments, there is no need for further discovery before resolving CNX's motion.

### D. DISCUSSION

Questions of arbitrability are governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.* "The FAA manifests 'a congressional declaration of a liberal federal policy favoring arbitration agreements.'" *Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 228 (3d Cir. 2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)). In doing so, the FAA "requires courts to place arbitration agreements 'on equal footing with all other contracts.'" *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S.Ct. 1421, 1424 (2017) (quoting *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 468 (2015)). Arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting 9 U.S.C. § 2).

When deciding a motion to compel arbitration under the FAA, courts engage in a two-step inquiry into "(1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 527 (3d Cir. 2009)). In assessing whether the dispute falls within the scope of the valid arbitration agreement, the Court applies a "presumption of arbitrability." *Century Indem. Co.*, 584 F.3d at 524 (quoting *AT & T Techs., Inc. v. Comm. Workers of Am.*, 475 U.S. 643, 650 (1986)). Under that presumption, "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."

*Id.* If the Court determines that an enforceable arbitration agreement exists, and that the dispute falls within the scope of the agreement, the FAA requires that the matter be referred to arbitration proceedings. 9 U.S.C. § 3.

Here, the parties do not dispute that the Arbitration Clause is valid and enforceable as between Henry and New Tech. The issue is whether CNX, a non-signatory to the Marketing Agreement, may enforce it against Henry.

　　　　1.　　The issue of arbitrability

The Third Circuit Court of Appeals has explained that "[w]hile federal policy favors arbitration agreements, an arbitrator has the power to decide an issue only if the parties have authorized the arbitrator to do so." *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 331 (3d Cir. 2014). Therefore, as a threshold matter, the Court must decide "whether the parties have submitted a particular dispute to arbitration, *i.e.*, the *question of arbitrability*[.]" *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 331 (3d Cir. 2014) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). The question of arbitrability is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *AT & T Techs.*, 475 U.S. at 649.

Relying on the Supreme Court's decision in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019), CNX contends that the question of arbitrability, that is, whether CNX can enforce the Arbitration Clause—must be decided by an arbitrator. CNX's argument unfolds as follows. The Arbitration Clause states that: "[a]ll claims, disputes or controversies . . . shall be decided by binding arbitration by the American Arbitration Association ["AAA"] in accordance with its Expedited Commercial Arbitration Rules." (Marketing Agreement ¶ 22.) AAA's Expedited Commercial Arbitration Rules, in turn, delegate to the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope,

or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." (ECF No. 25 at 8 (quoting AAA Commercial Arbitration Rules and Mediation Procedures, R. 7(a) (2013)).) Therefore, according to CNX, the Court should compel arbitration and have the arbitrator decide the question of arbitrability.

To the extent that CNX is relying on *Henry Schein* as establishing a categorical rule that "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, . . . a court possesses no power to decide the arbitrability issue[,]" (*id.* (quoting *Henry Schein*, 139 S. Ct. at 529)), several appellate courts, including the Third Circuit have rejected similar arguments. *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 237 n.7 (3d Cir. 2020) (citing *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 n.3 (2d Cir. 2019); *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 515 n.4 (5th Cir. 2019)). While "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also . . . 'whether the parties have agreed to arbitrate, [i.e., question of arbitrability,]'" in what is called a delegation clause, *Henry Schein*, 139 S. Ct. at 529 (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)), *Henry Schein* "did not change . . . the rule that courts must first decide whether an arbitration agreement exists at all." *Williams*, 965 F.3d at 237 n.7 (quoting *Lloyd's*, 921 F.3d at 515 n.4); *see Howsam*, 537 U.S. at 84 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)) ("[A] court should decide whether the arbitration contract bound parties who did not sign the agreement.").

Accordingly, before compelling Henry to arbitrate his claims against CNX, the Court, not an arbitrator, must consider "'whether the parties have a valid arbitration agreement at all' (i.e., its enforceability) . . . ." *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 519 (3d Cir. 2019) (quoting *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019)).

2.  Applicable law

Section 3 of the FAA "entitles litigants in federal court to a stay of any action that is 'referable to arbitration under an agreement in writing.'" *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 625 (2009) (quoting 9 U.S.C. § 3). The Supreme Court has explained that "because 'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel,'" *id.* at 631 (quoting 21 R. Lord, Williston on Contracts § 57:19, p. 183 (4th ed. 2001)), "a litigant who was not a party to the relevant arbitration agreement may invoke § 3 if the relevant state contract law allows him to enforce the agreement." *Id.* at 632. In applying the relevant state law, courts "do *not* invoke the presumption of arbitrability." *In re Remicade*, 938 F.3d at 520 (quoting *Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019)).

As CNX was not a signatory to the Marketing Agreement, it must rely on alternative theory in order to invoke the Arbitration Clause with respect to Henry's claims. CNX asserts that under Pennsylvania law, the theory of alternative equitable estoppel supports its position. (ECF No. 25 at 11.) According to CNX, the forum's law should apply as all the alleged underlying conduct and alleged unlawful conduct occurred in Pennsylvania. (*Id.* at 7 n.4 (citing *Travelers Ins. Co. v. Davis*, 490 F.2d 536, 542 (3d Cir. 1974)).

Henry counters that the choice of law clause in the Marketing Agreement mandates that Texas law applies. (ECF No. 30 at 1.) According to Henry, the theory of alternative equitable estoppel is not recognized under Texas law. (*Id.*) Because the parties dispute whether the applicable state law is that of Pennsylvania or Texas, a choice-of-law analysis must be undertaken.

When a federal court exercises federal question jurisdiction, as is the case here, the court must apply the choice-of-law rules of the forum state. *Riffin v. Consol. Rail Corp.*, 363 F. Supp. 3d 569, 575 (E.D. Pa.), *aff'd,* 783 F. App'x 246 (3d Cir. 2019). Pennsylvania has adopted a flexible interest/contacts methodology to resolve contractual choice-of-law questions. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007). However, a "choice-of-law analysis is unnecessary where the laws at issue do not conflict." *Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 454 n.9 (3d Cir. 2018) (citing *Hammersmith,* 480 F.3d 229–30).

Although Henry claims that the theory of alternative equitable estoppel is not recognized under Texas law, his contention is not supported by the authority he cites, *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624 (Tex. 2018). In that case, the Texas Supreme Court noted that under the alternative estoppel theory, "non-signatories can successfully compel arbitration when (1) they have a 'close relationship' with a signatory to a contract with an arbitration agreement and (2) the claims are 'intimately founded in and intertwined with the underlying contract obligations.'" *Id.* at 639 (quoting *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)). While acknowledging that Fifth Circuit Court of Appeals had predicted that the Texas Supreme Court "would adopt this estoppel formulation," *id.* (citing *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 612 (5th Cir. 2016)), the court in *Jody James* declined the opportunity to definitively adopt this theory because there was no showing of its applicability in that case. *Id.* Nonetheless, the *Jody James* court closely analyzed the theory and explained that "alternative estoppel requires not only a dispute intertwined with the contract but also a relationship between the parties that developed in a manner that makes it 'unfair' *not* to compel arbitration." *Id.* (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir.

9

2008)). "To compel arbitration based on this alternative-estoppel theory, the relationship must be closer than merely independent participants in a business transaction." *Id.* at 640.

Simply put, *Jody James* does not reject the validity of alternative estoppel theory. Therefore, the Court concludes that the Texas Supreme Court would apply this theory in appropriate circumstances. Similarly, under Pennsylvania's alternative equitable estoppel theory "non-signatories to an arbitration agreement can enforce such an agreement when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties." *Noye v. Johnson & Johnson Servs., Inc.*, 765 F. App'x 742, 746 (3d Cir. 2019) (quoting *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351 (Pa. Super. Ct. 2006)). Thus, although Texas and Pennsylvania courts articulate a slightly different test for this particular estoppel formulation, the laws at issue do not conflict. Therefore, the Court will apply the substantive law of Pennsylvania, the forum state.

### 3. CNX may enforce the Arbitration Clause

Pennsylvania allows a non-signatory to enforce an arbitration provision against a signatory "when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties.'" *Noye*, 765 F. App'x at 746 (quoting *Dodds*, 909 A.2d at 351). An "obvious and close nexus" may arise from *either* (a) the relationship between the signatories and the non-signatory *or* (b) the relationship between the non-signatory and the contract containing the arbitration obligation. *Id.* (citing *Provenzano v. Ohio Valley Gen. Hosp.*, 121 A.3d 1085, 1097 (Pa. Super. Ct. 2015); *Dodds*, 909 A.2d at 351).

Here, the Court finds that the requisite obvious and close nexus is satisfied not only because of CNX's relationship with a signatory, New Tech, but also based upon CNX's relationship with the Marketing Agreement, the contract that includes the Arbitration Clause. CNX relied on New

10

Tech to provide it with "consultants" such as Henry. New Tech screened, tested, and insured Henry before placing him at CNX. Indeed, Henry would not have been matched with CNX without going through New Tech's screening process and utilizing other services furnished by New Tech, including processing and paying his invoices and providing him with general commercial liability insurance. In addition, while CNX is not a party to the Marketing Agreement, the fact that the MSA is expressly incorporated into the Marketing Agreement is sufficient to establish an obvious and close nexus between CNX and the agreement containing the Arbitration Clause.

Finally, the issue raised by Henry in this lawsuit, that is, whether he was misclassified as an independent contractor, is expressly addressed in both the MSA and the Marketing Agreement. In the MSA, New Tech agreed to place applicants at CNX "as independent consultants and not as employees." (MSA at 5 ¶ 7.) The Marketing Agreement, in turn, obligated Henry to provide his services as "an independent contractor" to both New Tech and to CNX. (Marketing Agreement ¶ 14.) Henry agreed to work at CNX pursuant to the terms of the Marketing Agreement. Therefore, the Marketing Agreement, which contains the Arbitration Clause, is relevant to his claims against CNX. Not allowing CNX to compel arbitration would allow Henry to sidestep the Arbitration Clause by suing CNX as opposed to New Tech. Based on the foregoing, the Court concludes that Henry is equitably estopped from resisting arbitration.

Typically, the next step for the Court would be to determine "'whether a concededly binding arbitration clause applies to a certain type of controversy' (i.e., its scope)," *In re Remicade*, 938 F.3d at 519 (quoting *Lamps Plus*, 139 S. Ct. at 1416–17), "unless the parties have reserved the issue for an arbitrator." *Noye*, 765 F. App'x at 748 (citing *Opalinski*, 761 F.3d at 331). This brings the Court back to where it began its analysis—*Henry Schein*. Because the Arbitration Clause incorporates AAA's Expedited Commercial Arbitration Rules, the Court agrees with CNX that an

arbitrator, in the first instance, should decide whether the Arbitration Clause "covers [this] particular controversy.'" *Henry Schein*, 139 S. Ct. at 529. Accordingly, the case will be referred to arbitration for further proceedings.

    4.    A Stay is Appropriate

If a case referable to arbitration is brought in federal court, the FAA directs that the court where the lawsuit is pending "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. A stay of this case is appropriate because the Arbitration Clause delegates the question of ascertaining its scope to an arbitrator. Thus, an arbitrator will decide if Henry's claims are subject to arbitration and, if the arbitrator decides that some or all of Henry's claims are not subject to arbitration, then this case can proceed in this Court on the non-arbitrable claims.

As such, CNX's Motion to Dismiss need not be decided at this time and is denied without prejudice to be renewed if and when it becomes relevant.

E.    CONCLUSION

Based on the foregoing, it is respectfully recommended that Defendant's Motion to Compel Arbitration (ECF No. 20) be granted and the action be stayed pending the outcome of said arbitration. It is further recommended that Defendant's Motion to Dismiss (ECF No. 21) be denied without prejudice.

F.    NOTICE

In accordance with the Federal Magistrates Act, 28 U.S.C. § 636(b)(1), and Fed. R. Civ. P. 72(b)(2), the parties are allowed fourteen (14) days from the date of service to file written objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file

objections will waive the right to appeal. *Brightwell v. Lehman*, 637 F. 3d 187, 193 n.7 (3d Cir. 2011).

                                                                             /s/ Patricia L. Dodge
                                                                             PATRICIA L. DODGE
                                                                              United States Magistrate Judge

Dated: August 24, 2020